**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**


TAQUILLA HATCH, Individually and on
Behalf of all Others Similarly Situated                                                    PLAINTIFF


vs.                                              Case No. 4:18-cv-00580-JM


ARKANSAS TOTAL CARE, INC.,
CENTENE CORPORATION and
CENTENE MANAGEMENT COMPANY, LLC                                    DEFENDANTS


**<u>DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION</u>**

## I.    SUMMARY OF OPPOSITION

The Court must deny Plaintiff's Motion because there is no common policy of off-the-clock work. Plaintiff asserts that Defendants' alleged "commonly applied policy" is to "only pay Plaintiff and other Care Coordinators for the 8 a.m. to 5 p.m. schedule they were scheduled to work." (Original Complaint – Class and Collective Action, Doc. 1 ["Complaint"], ¶ 51; Declaration of Taquilla Hatch, Doc. 13-7 ["Hatch Decl."], ¶¶ 9-10, 12; *see also* Declaration of Phillip D'Anna, Doc. 13-8 ["D'Anna Decl."], ¶¶ 9-10, 12; Declaration of Jujuana Haywood, Doc. 13-9 ["Haywood Decl."], ¶¶ 9-10, 12.) However, Plaintiff's theory is directly contradicted by her own employment records, which show that she reported time worked outside her 8 a.m. to 5 p.m. schedule, and received both regular and overtime pay for this time. The FLSA does not support conditional certification where, as here, the supposed "common" premise upon which the proposed collective is based is nonexistent, and litigation of Plaintiff's claims will require an individual examination of the employment circumstances and practices of each employee.

As detailed below, Defendant Arkansas Total Care Inc.'s written policies require that Care Coordinators report and be paid for all time worked, and explicitly prohibit all off-the-clock work. Whether any Care Coordinator deviated from this policy would require a case-by-case analysis not suitable for collective treatment.

## II.    PROCEDURAL POSTURE

On August 27, 2018, Plaintiff Taquilla Hatch ("Plaintiff") filed her Complaint alleging that Defendants violated the federal Fair Labor Standards Act ("FLSA") and Arkansas state law as a result of Defendants' alleged "failure to pay Plaintiff and other Care Coordinators lawful overtime compensation for hours worked in excess of forty (40) hours per week." (*See* Complaint, ¶ 2.)  Plaintiff's Complaint names three entities as "Defendants" – Arkansas Total Care, Inc. ("Arkansas Total Care"); Centene Corporation ("Centene"); and Centene Management

Company, LLC ("Centene Management") (*See id.* ¶¶ 20, 26, 32.)  However, Plaintiff alleges that she worked only as a Care Coordinator in Arkansas for Centene's subsidiary entity, Arkansas Total Care. (*See id.* ¶ 45.) Plaintiff claims that she and putative class members were paid only for the "8 a.m. to 5 p.m. schedule they were scheduled to work." (*Id.* ¶ 51.) Plaintiff admits she was paid for all time spent traveling and meeting with members, but claims she was not paid for time she spent in the evenings entering member notes. (*See* Hatch Decl., ¶¶ 9-10, 12; *see also* D'Anna Decl., ¶¶ 9-10, 12; Haywood Decl., ¶¶ 9-10, 12.)

On October 16, 2018, Plaintiff filed a Motion for Conditional Certification, for Disclosure of Contact Information, and to Send Notices (Doc. 13) ("Plaintiff's Motion") and brief in support (Doc. 14) ("Plaintiff's Brief"). Plaintiff's proposed Consent to Join Collective Action indicates that any plaintiffs joining the FLSA collective action must have worked as a "Care Coordinator for Defendants Arkansas Total Care, Inc., Centene Corporation **and** Centene Management Company, LLC." (Doc. 13-2 [emphasis added].) Plaintiff's Motion thus limits her representative action to "Care Coordinators" who worked in the State of Arkansas for Arkansas Total Care. (*See* Docs. 13-1, 13-2.)

## III.    RELEVANT FACTS

### A.    Arkansas Total Care Operates Only In Arkansas.

The State of Arkansas operates under a unique Medicaid model to deliver healthcare to Medicaid-eligible Arkansas residents who have behavioral health and/or intellectual and developmental disabilities. (*See* accompanying Declaration of Candace Gaddis ["Gaddis Decl."], ¶ 3.) This model is called a "Provider-led Arkansas Shared Savings Entity" or "PASSE." (*Id.*) PASSE organizations consisting of groups of providers of specialty health services and health insurance carriers. (*Id.*) Centene's subsidiary, Arkansas Total Care, is a PASSE entity that has partnered with Mercy Health, which operates hospitals in Arkansas, and LifeShare, which is a

community-based provider in Arkansas. (*Id.*, ¶ 4.) In February 2018, Arkansas Total Care began managing a complex Medicaid population with behavioral and/or intellectual and development disabilities. (*Id.*, ¶ 7.)

Arkansas Total Care is a separate legal entity, and it is functionally and operationally distinct from Centene's other business lines. (*Id.*, ¶ 5.) In fact, the Arkansas Total Care PASSE model is unique as compared to health plans in other states. (*Id.*, ¶ 5.) For example, Arkansas Total Care is the only health plan that uses a provider-led model. (*Id.*) Moreover, Arkansas Total Care's services are governed by specific requirements in a separate contract with the Arkansas Department of Human Services ("DHS"). (*Id.*, ¶ 4.) No other health plan is subject to the same contract or requirements. (*Id.*, ¶ 5.)

**B.      Care Coordinators Are Exclusive To The Arkansas Total Care PASSE Program.**

When Arkansas Total Care contracted with DHS in late 2017, Centene Management created a new "Care Coordinator" position specifically for the Arkansas Total Care PASSE program because of their unique responsibilities. (*Id.*, ¶ 6.) Care Coordinators started providing care coordination services for beneficiaries or "members" of the PASSE program in February 2018. (*Id.*, ¶ 8.)  For example, they coordinate heath education, diagnostic, hospital services, and community-based management of medication therapy. (*Id.*) Care Coordinators primarily meet in person with members at the members' homes to evaluate their individual health needs, and ensure that members schedule the correct medical appointments and receive the services they require, although some of this work can be done over the telephone after the first in-person visit. (*Id.*)

Care Coordinators are non-exempt hourly employees who are either office-based or entirely remote. (*Id.*, ¶ 9.) Originally the Care Coordinators were all office-based in Little Rock,

but Arkansas Total Care eventually introduced remote Care Coordinators (also called field staff) to service more diverse geographic areas. (*Id*.) Care Coordinators report to one of six different supervisors. (*Id*., ¶ 9.)   Each supervisor oversees the production and work of the Care Coordinators assigned to them, which includes monitoring their timesheets and working with each Care Coordinator individually to make sure they are managing their own workload effectively. (*Id*.) Depending on their background, education, and skills, the efficiency of the Care Coordinators can vary widely. (*Id*.)

### C.    Arkansas Total Care's Policies Require That Care Coordinators Report All Time Worked And Explicitly Prohibit Falsifying Time Records.

Care Coordinators are instructed to record their work time on a daily basis using the Company's timekeeping system. (*Id*., ¶ 18.) Employees are encouraged to record their "actual time worked in real time" using the automated timekeeping system, i.e., to clock in and out as they commence and end working. (*Id*.) Each Care Coordinator is issued a Company cell phone and a Chromebook computer which they may use to clock in and out on the Company's automated time system. (*Id*.) However, employees also have the ability to easily access the system and adjust their clock in and out times, report additional time, and make other edits to ensure the accuracy of their entries. (*Id*.) Some employees, like Plaintiff, did not always record their time on a daily basis, although they were supposed to do so. (*Id.*, ¶ 19.) Each and every pay period employees are required to review their timecards for accuracy and submit any corrections. (*Id*., ¶ 23.)

When employees begin employment, they receive a copy of the Employee Handbook, which sets forth the Company's policies on timekeeping. (*Id*. ¶ 14, Ex. 1.)   The Employee Handbook provides that non-exempt employees must "accurately record the time they work each day, including arrival, departure, and meal break times." (*Id*., Ex. 1, p. 15.) "Non-exempt

employees must report all time worked" and "time when they are instructed to work outside scheduled hours." (*Id*.)  The Employee Handbook further provides:

> It is a violation of the Company's policy for anyone to instruct or encourage another employee to work "off the clock," to incorrectly report hours worked, or to alter another employee's time records. If any employee is directed or encouraged to incorrectly report hours worked, or to alter another employee's time records, they should report the incident immediately to a supervisor or the local [Human Resources representative].

(*Id*.) The policies contained in the Employee Handbook also prohibit:

> Falsification of any time card or record, entering time for or permitting time to be entered by someone else; altering time records to make them reflect more or less time than that actually worked; directing, coercing or encouraging someone to work "off the clock" or submit inaccurate time records;

 (*Id*., p. 10.) Centene also maintains Timekeeping and Overtime policies that emphasize these points. (Gaddis Decl., ¶ 15, Exs. 2 and 3.)  Employees receive training about these policies at the time they are hired. (Gaddis Decl., ¶ 16, Ex. 4.) Managers also receive training about these policies. (Gaddis Decl., ¶ 17, Ex. 5.)

Employees have multiple avenues for making complaints about timekeeping and pay practices, including Human Resources, their supervisor, their higher-level manager, or a third-party telephone hotline. (*Id*., ¶ 24.) These avenues are discussed in New Hire Orientation and reiterated in the Company's written policies on CNET (the Company's intranet). (*Id*., ¶ 24, Ex. 6.) The Company ensures that all complaints are investigated thoroughly and appropriate action is taken depending on the findings of the investigation. (*Id*., ¶ 25.) Arkansas Total Care is not aware of any complaint about off-the-clock work by any employee, including Plaintiff, aside from this lawsuit. (*Id*.)[1]

---

[1] Plaintiff made use of the Company's complaint procedures regarding non-wage and hour issues, and thus clearly knew how to follow them. (*See id*.)

**D.    Care Coordinators Have Discretion As To How They Schedule Their Workday.**

Each Care Coordinator must determine how a task will be completed in the allotted time and schedules. (Gaddis Decl., ¶ 20.) The Care Coordinator must organize his or her day by scheduling appointments, making telephone calls, and deciding when and how to follow up with members and providers. (*Id.*) Care Coordinators may visit one or several members in a day, and visits range from 30 to 90 minutes depending on the particular member's needs. (*Id.*)  Care Coordinators are directed to take their Company-issued Chromebooks (portable computers) with them to member meetings and enter notes while meeting with the member whenever possible. (*Id.*) However, not all Care Coordinators have followed this direction. (*Id.*, ¶ 22.) For example, Opt-in Plaintiff Phillip D'Anna often had difficulties with his computer and would handwrite notes while meeting with members. (*Id.*) However, he was observed catching up on documentation while in the office. (*Id.*) Mr. D'Anna had a second job in the evenings, and therefore it is difficult to understand how he could have been performing work for Arkansas Total Care in the evenings as alleged by Plaintiff. (*Id.*)

Approximately 60 percent of the Care Coordinators are office-based, meaning that they typically report to the Little Rock office in the morning around 8 a.m.  (*Id.*, ¶ 10.) From there, they schedule member meetings and handle administrative tasks including submitting documentation from member meetings. (*Id.*) After completing any necessary administrative tasks, Care Coordinators typically leave the office and spend the rest of the day meeting with members. (*Id.*)

By contrast, remote Care Coordinators (approximately 40 percent) work entirely from their homes or in the field. (*Id.*, ¶ 11.) Remote Care Coordinators typically live more than an hour from the Little Rock office. (*Id.*) Remote Care Coordinators do not report to an office

except for occasional training. (*Id.*)

Based on the caseload assigned to each Care Coordinator, they should typically have enough time to complete all administrative work related to their job during the normal workday. (*Id.*, ¶ 21.) Care Coordinators have flexibility as to how to accomplish their work during their regular workday. For example, while Plaintiffs and the Opt-in Plaintiffs were employed, Arkansas Total Care required that member notes be submitted in the system within three days of the member meeting. (*Id.*, ¶21.) Thus, if a Care Coordinator met with a member on Monday and did not type notes during the meeting as instructed, the Care Coordinator would have until Thursday to enter the notes, and could set aside time to do this during the day. (*Id.*)[2] If Care Coordinators perform work outside the regular business day, they are told to report this time and they are always paid for the additional time. (*Id.*, ¶ 23.) Again, aside from this lawsuit, no Care Coordinator has reported that they performed work outside of regular business hours and were not paid for the work. (*Id.*)

### E. Plaintiff And Opt-in Plaintiffs Reported To The Same Supervisor, Were Based Out Of The Little Rock Location, And Were Paid For Overtime.

Plaintiff and the two Opt-in Plaintiffs (who are the only declarants in support of Plaintiff's Motion) were all office-based Care Coordinators reporting to the Little Rock location. (*Id.*, ¶ 12.) They also reported to the same supervisor, Terrez Grider, Supervisor of Medical Management. (*Id.*) Plaintiff Hatch worked for Arkansas Total Care for six months. (*Id.*) The two Opt-in Plaintiffs worked for Arkansas Total Care for five and three months, respectively. (*Id.*)

In compliance with Arkansas Total Care's policy, all Care Coordinators, including Plaintiff and the two Opt-in Plaintiffs, were paid one and one-half times their regular rate of pay

---

[2] These expectations have changed over time.  In the beginning, Care Coordinators simply had to enter their notes before the end of the week. (*Id.*)  A couple of months ago, Arkansas Total Care started asking Care Coordinators to submit their documentation within a day, because they were expected to use their Chromebooks to type the notes during their visits. (*Id.*)

for all hours worked in excess of 40 in a workweek. (*Id.*, ¶ 26.) Records show that Plaintiff and the Opt-in Plaintiffs reported working outside their regularly scheduled workweek and received overtime pay for this time. (*Id.*, ¶¶ 26-28, Exs. 7-8.) Significantly, these records contradict Plaintiff's claim that Care Coordinators did not receive pay for hours worked outside of the regularly scheduled workweek. (*See* Hatch Decl., ¶ 12; D'Anna Decl., ¶ 12; Haywood Decl., ¶ 12.) Thus, Plaintiff and the Opt-in Plaintiffs understood Arkansas Total Care's policy that all time worked, including time worked outside of the regularly scheduled workweek, must be reported. The fact that Plaintiff herself reported overtime outside of her regularly-scheduled workweek is conclusive evidence that completely rebuts her claim that employees are not permitted to record time outside of their scheduled workday.[3]

## IV. THE COURT MUST DENY PLAINTIFF'S MOTION BECAUSE SHE HAS NOT MADE A MODEST FACTUAL SHOWING OF A COMMON POLICY TO VIOLATE THE FLSA, AND THIS CASE IS INAPPROPRIATE FOR COLLECTIVE TREATMENT.

### A. Conditional Certification Should Only Be Granted In Appropriate Cases.

Generally, "litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 338-39 (2011). The FLSA provides a limited exception, under which the Court *may* allow named plaintiffs to sue for other individuals only if they first prove that they are "similarly situated." 29 U.S.C. § 216(b). "Although a district court has discretion to authorize notice to similarly situated employees of the opportunity to opt-in to a class, the giving of such notice is not mandatory." *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 944 (W.D. Ark. 2003) (*citing Hoffman-La Roche, Inc. v. Sperling,* 493 U.S.

---

[3] The District Courts in Arkansas do not disregard relevant evidence, and here the evidence that Plaintiff and the Opt-in Plaintiffs were paid overtime for hours worked outside their regular shifts is highly relevant. *See generally, e.g., Salter v. Onyx Corp.*, Case No. 4:10CV00906 JLH, 2011 U.S. Dist. LEXIS 23291, at *5 (E.D. Ark. Feb. 4, 2011) (Holmes, J.); *Freeman*, 256 F. Supp. 2d at 945.

165, 170-71 (1989)). Consistent with this principle, courts have the "responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation." *Freeman*, 256 F. Supp. 2d at 944 (citations omitted); *Vinsant v. MyExperian, Inc.,* No. 2:18-CV-02056, 2018 U.S. Dist. LEXIS 111784, at *3, 5 (W.D. Ark. Jul. 5, 2018) (citations omitted). Conditional certification must only be granted where "hearing the cases together promotes judicial efficiency." *Id.*

To satisfy their burden, plaintiffs seeking conditional certification of an FLSA collective action must make a "modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Collins v. Barney's Barn, Inc*., No. 4:12CV00685 SWW, 2013 U.S. Dist. LEXIS 54955, at *7 (E.D. Ark. Apr. 17, 2013) (Wright, J.). "[M]ere allegations will not suffice, some factual evidence is necessary." *Wright v. Pulaski Cty*., No. 4:09CV00065 SWW, 2010 U.S. Dist. LEXIS 87283, at *34 (E.D. Ark. Aug. 24, 2010) (Wright, J.); *Wheeler v. Baxter Healthcare Corp*., No. 4:11CV00263 JLH, 2011 U.S. Dist. LEXIS 129585, at *6-8 (E.D. Ark. Nov. 8, 2011) (Holmes, J) (finding plaintiffs' declarations insufficient evidence that other employees are similarly situated; collecting cases).

The district court's power to authorize notice in an FLSA collective action "should be exercised *only* **in 'appropriate cases'**," where plaintiffs make a threshold showing that they are similarly situated. *Simmons v. Valspar Corp*., Case No. 10-3026, 2011 U.S. Dist. LEXIS 39340, at *18 (D. Minn. Apr. 11, 2011) (emphasis added); *see also Hoffman-La Roche*, 493 U.S. at 169 (same). Plaintiffs must identify meaningful identifiable facts or a legal nexus binding their claims "so that hearing the cases together furthers the purposes of section 216, is fair to both parties, and does not result in an unmanageable trial." *Morris v. R.A. Popp Enters*., Case No. 8:11-CV-263, 2012 U.S. Dist. LEXIS 19273, at *10 (D. Neb. Jan. 20, 2012) (citations omitted); *see also*

*Vinsant*, 2018 U.S. Dist. LEXIS 111784, at *5 (same). If a trial would require 'individualized determinations to resolve the claims of each plaintiff, certification as a collective action may be inappropriate.'" *Martinez v. Cargill Meat Sols.,* 265 F.R.D. 490, 498 (D. Neb. 2009) (citation omitted).

> As succinctly noted by the Eastern District of Arkansas:

> A variety of factors may be considered in determining whether a case is suited to proceed as a collective class action, including (1) disparate factual and employment settings of the individual plaintiffs, (2) defenses available to the defendant that appear to be individual to each plaintiff, and (3) fairness and procedural considerations.

*Wright*, 2010 U.S. Dist. LEXIS 87283, at *34; *see also Vinsant*, 2018 U.S. Dist. LEXIS 111784, at *6 (Chief Justice Holmes describing the factors as "(1) **employment and factual settings of plaintiffs**; (2) various **defenses available to defendants**; and (3) considerations of **fairness, procedure, and manageability**" [emphasis added]). This Court has also noted the importance of other factors, including:

> 1) whether plaintiffs hold the same job title; 2) whether they worked in the same geographic location; 3) whether the alleged violations occurred during the same period; 4) whether plaintiffs were subjected to the same policies and practices; and 5) the extent to which the acts constituting the alleged violations are similar.

*Nixon v. ETS Oilfield Servs. L.P.*, No. 4:13CV00726 JMM, 2015 U.S. Dist. LEXIS 179575, at *5 (E.D. Ark. Jan. 6, 2015) (Moody, J.).

Here, putative collective members travel and work in different geographic areas, report to different supervisors, work under different conditions (either entirely remotely or office-based), are subject to different member demands, and have different schedules, "all of which present disparate factual and employment settings that affect [whether or not any violation occurred]." *See Wright*, 2010 U.S. Dist. LEXIS 87283, at *35. Evaluating the relevant factors, Plaintiff has not established that she is similarly situated to the proposed putative collective. *See id.* Notice is

not automatic. In this particular case, like many other cases before the district courts in Arkansas, conditional certification is inappropriate.[4]

> **B.      Plaintiff's Vague And Unsupported Allegations Of Which She Has No Personal Knowledge Are Insufficient To Carry Her Burden.**

"[U]nsupported assertions of widespread violations are not sufficient to meet Plaintiff's burden." *Freeman*, 256 F. Supp. 2d at 945; *see also Wright*, 2010 U.S. Dist. LEXIS 87283, at *34 ("mere allegations will not suffice; some factual evidence is necessary"); *Adams v. Hy-Vee, Inc.,* Case No. 11-00449, 2012 U.S. Dist. LEXIS 98590, *11 (W.D. Mo. May 22, 2012) ("unsupported assertions or those not based on personal knowledge will not establish that plaintiffs are similarly situated"). Here, the only evidence offered by Plaintiff consists of identical declarations of Plaintiff and the two Opt-in Plaintiffs (*see* Docs. 13-7, 13-8, 13-9). These declarations, however, are insufficient to satisfy Plaintiff's burden because the allegations regarding other employees consist of vague and unsupported allegations, and are not based on personal knowledge.

Plaintiff has admitted that she was paid for all time spent meeting with patients and all travel time, and claims that the *only* time for which she and other Care Coordinators were not paid was "hours spent writing the mandatory member notes each evening." (Hatch Decl., ¶¶ 9-10; *see also* D'Anna Decl., ¶¶ 9-10; Haywood Decl., ¶¶ 9-10.) Thus, the only alleged unpaid

---

[4] *See e.g., McLendon v. Schlumberger Tech. Corp.,* No. 4:15CV00752 JLH, 2016 U.S. Dist. LEXIS 92249 (E.D. Ark. Jul. 15, 2016) (Holmes, J.); *Butcher v. Delta Mem'l Hosp.,* No. 5:12CV00241 SWW, 2013 U.S. Dist. LEXIS 54964, at *10-13 (E.D. Ark. Apr. 17, 2013) (Wright, J.); *Collins*, 2013 U.S. Dist. LEXIS 54955; *Farnsworth v. Welspun Tubular LLC*, No. 4:11-cv-619-DPM, 2012 U.S. Dist. LEXIS 115398 (E.D. Ark. Aug. 16, 2012) (Marshall, J.); *Dewitt v. Securitas Sec. Servs. USA, Inc.,* No. 4:11-cv-873-DPM, 2012 U.S. Dist. LEXIS 71590 (E.D. Ark. May 23, 2012); *Salter*, 2011 U.S. Dist. LEXIS 23291, at *5; *Wheeler*, 2011 U.S. Dist. LEXIS 129585; *Madden v. Lumber One Home Ctr. of Stuffgart, Inc.*, Case No. 4:10CV01162 JLH, 2010 U.S. Dist. LEXIS 127558, at *14-15 (E.D. Ark. Dec. 2, 2010) (Holmes, J.); *Pressler v. FTS USA, LLC*, No. 4:09CV00676 JLH, 2010 U.S. Dist. LEXIS 55181 (E.D. Ark. May 12, 2010) (Holmes, J.); *see also generally, e.g., Freeman*, 256 F. Supp. 2d 941.

time at issue is time after 5 p.m., after Care Coordinators presumably return home from work, and allegedly enter patient notes using their assigned Chromebooks. Plaintiff's conclusory assertion that other employees are similarly situated is unfounded because there is no basis to conclude that other employees entered member notes in the evening and did not record the time worked. (*See* Hatch Decl.; D'Anna Decl.; Haywood Decl.) Not only do the records show Plaintiff herself knew to report hours worked outside of her regular shift and that Plaintiff was paid for such time, but Plaintiff also provides no explanation for how she could possibly have personal knowledge of time spent by other employees in the evening after ending their work day. (*See* Hatch Decl.) Though Plaintiff in her declaration states she witnessed other Care Coordinators working during the workday, this is irrelevant as to whether other Care Coordinators worked from their homes after 5 p.m. (*See* Hatch Decl., ¶ 13.) Because Plaintiff submits no evidence of a common policy requiring employees to work in the evenings off-the-clock, her allegations are insufficient.

When faced with similar unsupported allegations regarding other employees, courts have routinely denied conditional certification. *See Dewitt*, 2012 U.S. Dist. LEXIS 71590 (finding plaintiffs' evidence was "just too thin and conclusory" for conditional certification); *McLendon*, 2016 U.S. Dist. LEXIS 92249, at *10; *Freeman,* 256 F. Supp. 2d at 945 (denying conditional certification of overtime claim where plaintiff failed to present sufficient evidence that proposed collective class was similarly situated); *McElroy v. Tucker Energy Servs*., No. SA-18-CV-00010-FB, 2018 U.S. Dist. LEXIS 183072, at *13 (W.D. Tex. Oct. 25, 2018); *Mathis v. Stuart Petroleum Testers, Inc*., No. 5:16-cv-094-RP, 2016 U.S. Dist. LEXIS 115334, at *9 (W.D. Tex. Aug. 29, 2016).

Indeed, the declarations filed in support of Plaintiff's motion are very similar to

declarations filed by Plaintiff's counsel in other cases seeking conditional certification under the FLSA. *See e.g., McElroy v. Tucker Energy Servs.*, No. SA-18-CV-00010-FB (W.D. Tex.) (Declaration of Brandon McElroy, Doc. 13-1, filed 6/12/18).[5] The Eastern District of Arkansas and at least two other courts have rejected these same declarations drafted by Plaintiff's counsel as too generalized and conclusory to support certification. *See McLendon*, 2016 U.S. Dist. LEXIS 92249, at *10; *McElroy*, 2018 U.S. Dist. LEXIS 183072, at *13; *Mathis*, 2016 U.S. Dist. LEXIS 115334, at *9. Here, the three declarations offered by Plaintiff are identical. (*See* Docs. 13-7 to 13-9.) The same type of conclusory language in these three declarations was recently rejected by the District Court for the Western District of Texas, and likewise should be rejected here. *McElroy*, 2018 U.S. Dist. LEXIS 183072, at *13-14; (*compare* Attachment A [Declaration of Brandon McElroy], ¶¶ 6, 10 ["I personally observed the other members of my team doing the same type of work I did."; "Based on my observations of the other employees I worked with, and the type of projects we worked on, long hours in excess of forty (40 hours per week were typical for all Oilfield Workers."] *with* Doc. 13-7 ["Other Care Coordinators were paid in the same manner I was paid and worked similar hours to me. I know this because I witnessed other Care Coordinators working similar hours at the locations where I worked and because I spoke with other Care Coordinators that complained about the hours they worked and how they got paid."].)

In another example where testimony similar to that offered by Plaintiff here was found insufficient to support conditional certification, the plaintiff claimed that it was defendants' corporate policy to not pay for time spent on tasks outside the workplace. *Dado v. Speedway SuperAmerica LLC*, No. 08-CV-1107 (PJS/RLE), 2009 U.S. Dist. LEXIS 3816, at *10 (D. Minn.

---

[5] It is axiomatic that this Court may take judicial notice of filings of public record. *See Graham v. Catamaran Health Sols. LLC*, No. 16-1161, 2017 U.S. App. LEXIS 16133, at *7 n.1 (8th Cir. Aug. 23, 2017). For the Court's convenience, a copy of Mr. McElroy's Declaration is filed herewith as "Attachment A."

Jan. 20, 2009). However, the court found that the testimony of a single employee about unpaid time was insufficient "particularly in light of the evidence" defendant submitted showing that it included overtime in its labor budget. In another case, the court rejected plaintiffs' declarations, explaining that an "affiant must testify about what he observed himself and not speculate about what he thinks happened." *Sjoblom v. Charter Communications, LLC*, 2007 U.S. Dist. LEXIS 93879, at *32 (W.D. Wis. Dec. 19, 2007).

In another case, the court held that allegations similar to those asserted by Plaintiff here were insufficient to meet the plaintiff's burden for conditional certification because the plaintiff did not "provide any detail about these observations, such as how often he and others work overtime, what he believed was overtime hours, or how he concluded that overtime was compensated." *Simmons v. T-Mobile USA, Inc.*, No. H-06-1820, 2007 U.S. Dist. LEXIS 5002, at *2 (S.D. Tex. Jan. 24, 2007). Like the plaintiffs in the *Dado, Sjoblom, Simmons* cases (and in the numerous other cases in which FLSA conditional certification has been denied), the cursory conclusions by Plaintiff and the two Opt-in Plaintiffs about their co-workers do not provide sufficient foundation for them to testify that other individuals worked off-the-clock or were not paid for all time worked.  Plaintiff cites no case in which conditional certification was granted based on a similar paucity of evidence of an alleged common unlawful policy, let alone in the face of directly contradictory evidence (such as Plaintiff's own timekeeping and payroll records in this case). (*See* Gaddis Decl., ¶¶ 26 - 28, Ex. 7 [demonstrating Plaintiff was paid for hours worked outside her regular schedule].) The Court must deny Plaintiff's Motion because it is based exclusively on speculation and unsupported allegations (rather than personal knowledge), and is not based on any factual evidence that other Care Coordinators are required to work off-the-clock.

### C. The Putative Class Members Are Not Victims Of A Single Decision, Policy, Or Plan Requiring Off-The-Clock Work.

#### 1. The Company's Written Policies Unequivocally Prohibit Off-The-Clock Work.

As described and detailed above, the Company has acted diligently to clearly establish and enforce explicit policies prohibiting any employee from working off-the-clock. *See* Section III.C, *supra*. The Company's written policies require employees to accurately record their time to ensure they are paid for all hours worked, and prohibit off-the-clock work. (*See* Gaddis Decl., ¶¶ 14-17, Exs. 1-6.) These policies are part of the training that new employees and managers receive, and the policies are strictly enforced. (*See id*.). There is nothing unlawful about a policy that places the burden on employees to report the time they worked in order to be compensated. *See Valcho v. Dallas County Hospital Dist.*, 574 F. Supp. 2d 618, 623 (N.D. Tex. 2008); *Simmons*, 2007 U.S. Dist. LEXIS 5002, at *7.

Plaintiff and the two Opt-in Plaintiffs certified their work hours and made no effort to report any concerns about alleged off-the-clock work through any of the means available to them, including not only their supervisors, but also human resources and a third-party telephone hotline. (*See* Gaddis Decl., ¶¶ 23-25.) Indeed, the Company is unaware of any complaints about Care Coordinators working off-the-clock with the exception of this lawsuit. (*See id.*, ¶¶ 23, 25.) Additionally, in direct contrast to their claims that they were not permitted to record work time beyond their regularly scheduled forty-hour workweek, Plaintiff and the Opt-in Plaintiffs regularly reported working overtime and were paid for overtime hours. (*See id.* ¶¶ 26-28, Exs. 7, 8.) Plaintiff has failed to present any evidence that Defendants' policies or procedures violate the FLSA.

### 2. Plaintiff Has Not Identified Any *De Facto* Unlawful Policy Common To All Members Of The Proposed Collective.

Because the Company's written and explicit policies are lawful, to prevail on her Motion Plaintiff must present evidence that Defendants operated according to an unofficial *de facto* policy that violated the FLSA. *See, e.g., Dado*, 2009 U.S. Dist. LEXIS 3816, at *8 (denying conditional certification, finding plaintiff provided no "colorable basis for the existence of a central corporate policy" or that the employer ignored its written policies and required employees to work off-the-clock); *Ray v. Motel 6 Operating, Ltd. P'ship*, Case No. 3-95-828, 1996 U.S. Dist. LEXIS 22565, at *11 (D. Minn. Feb. 15, 1996) ("[T]he illegal overtime plan alleged by Plaintiffs in the present action is not necessarily carried out through central management. First, official written policy dictates that overtime will be paid in accordance with the FLSA. Second, if an illegal scheme exists at all, it is implemented on a decentralized level. . . . The evidence does not indicate that all the Plaintiffs sustained injury from one unlawful policy.").

For example, in *Dado*, the plaintiffs submitted evidence that "a handful of employees were not compensated for answering work-related phone calls or performing gas-price surveys." 2009 U.S. Dist. LEXIS 3816, at *4. The court held that this is "not sufficient to merit conditional certification . . . [i]nstead plaintiffs must submit evidence that the **reason why** the employees were not compensated for these tasks is **not because of human error or a rogue store manager, but because of a corporate decision** to ignore [the employer]'s published policies and refuse to pay for answering work-related phone calls or performing gas-price surveys." *Id.* at *5-6 (emphasis added; concluding that plaintiffs failed to establish a colorable basis that such a "policy-to-violate-the-policy" exists).

Similarly, the Honorable Judge Marshall in *Farnsworth* denied the plaintiffs' motion to

conditionally certify a class of employees who were allegedly misclassified as exempt from overtime where the plaintiffs demonstrated no centralized policy. 2012 U.S. Dist. LEXIS 115398, at *4. According to Judge Marshall, "the fact that this small fraction of employees in a particular subdepartment allege that they were misclassified 'provides almost no evidence that the reason that these employees were [misclassified] was because of an unlawful companywide policy.'" *Id.* (citations omitted).

Here, Plaintiff's declarations demonstrate that putative class members work independently and spend much of their time traveling to meet with members in different geographic areas. (Hatch Decl., ¶ 4; *see also* D'Anna Decl., ¶ 4; Haywood Decl., ¶ 4; *see also* Gaddis Decl., ¶¶ 8-11, 20-21.) The putative collective is divided by those who work entirely remotely and those who are office-based, and further divided into separate supervisory structures, with each Care Coordinator managed by one of six different supervisors. (Gaddis Decl., ¶¶9-11.) Thus, putative collective members have varying schedules, work in different geographic areas, and receive different directions from different supervisors, "all of which present disparate factual and employment settings that affect [whether any violation occurred.]" *See Wright,* 2010 U.S. Dist. LEXIS 87283, at *35.

Plaintiff's mere assertion that she completed paperwork off-the-clock in the evening does not provide a sufficient basis for conditionally certifying even a small collective of non-exempt employees. *See e.g., Freeman*, 256 F. Supp. 2d at 945 (holding conditional certification is inappropriate if supported only by a few employees' claims that they were not paid for overtime); *Jimenez v. Lakeside Pic-N-Pac, LLC*, 2007 U.S. Dist. LEXIS 91989 (W.D. Mich. Dec. 14, 2007) (denying conditional certification, finding plaintiff's alleged practice of not recording work hours insufficient), *cited with approval in Collins*, 2013 U.S. Dist. LEXIS 54955,

at *7. Plaintiff does not claim that anyone directed her to work off-the-clock. However, even if she has implied that a supervisor is acting outside of the Company's clear requirements that all time worked must be reported, when any alleged off-the-clock work is due to the direction of individual rogue supervisors and not a company-wide plan or policy, conditional certification is not warranted. *See Saleen v. Waste Mgmt., Inc.,* No. CIV 08-4959(PJS/JJK), 2009 U.S. Dist. LEXIS 49891, at *12 (D. Minn. June 15, 2009), *aff'd,* 649 F. Supp. 2d 937 (D. Minn. 2009) (denying conditional certification where plaintiffs failed to provide a colorable basis of a central corporate policy); *Thompson v. Speedway SuperAmerica, LLC,* Case No. 08-1107, 2008 U.S. Dist. LEXIS 115050 (D. Minn. Aug. 21, 2008)  (same).

*Caballero v. Kelly Servs.,* No. H-14-1828, 2015 U.S. Dist. LEXIS 137475 (S.D. Tex. Oct. 5, 2015), is instructive. In *Caballero*, a group of recruiters who worked remotely from their homes filed an FLSA collective action asserting that their employer required them to work over 40 hours per week but never compensated them for overtime. *Id.* at *3-4.  The court found that declarations submitted by the plaintiffs failed to support allegations of an unwritten company-wide policy regarding overtime. *Id.* at *5-6. Referring to one of the employee declarations, the *Caballero* court found that he did "not attest to a specific directive from his superiors at Kelly Services or any written communications that recruiters should not record overtime that they worked," and neither named specific supervisors who adopted the unwritten practice nor referred to "specific acts or statements that provide a basis for [his] impressions," but rather merely stated that "he did not record his own overtime because he knew there would be pushback from Kelly Services management." *Id.* at *15-16. The court stated: "Any actions by [the employee] pursuant to his personal or unilateral understanding of what [defendant] would prefer are, at best, evidence

of a potential FLSA violation by a single manager. *Id.* at *18 n.9.[6] As in *Caballero*, Plaintiff here has not demonstrated the existence of a common decision or policy that violates the FLSA.

Without a single, centralized decision or policy that violates the FLSA, determining the individual claims of putative collective members together in a single action would be unmanageable and inefficient. *See e.g., Evans v. Contract Callers, Inc.*, 2012 U.S. Dist. LEXIS 8573, *17 (E.D. Mo. Jan. 25, 2012) (denying motion to reconsider denial of conditional certification and stating, "despite the policy that one hour be deducted from an employee's daily compensable time for lunch, there nevertheless was evidence that such time was not deducted" for all putative collective members).[7] Each individual would have to testify concerning whether he or she actually worked off-the-clock in the evening, the frequency and duration of such work, whether the employee was advised not to report the work time, and whether the employee did in fact record any of the time. *See e.g., Douglas v. First Student, Inc.,* 888 F. Supp. 2d 929, 934 (E.D. Ark. 2012) ("The problem with granting FLSA class status . . . is that **each plaintiff must individually prove that she worked more than forty hours in any given week** for which she claims damages. Therefore, a determination of . . . liability under the FLSA would require a highly individualized inquiry as to each class member's circumstances every day of every week. Indeed, **individualized inquiries would also have to be conducted to determine whether any**

---

[6] *See also, e.g., Braun v. Superior Indus. Int'l, Inc.,* No. 09-2560-JWL, 2010 U.S. Dist. LEXIS 102863, at *20 (D. Kan. Sept. 28, 2010) (denying nationwide certification because alleged policy was implemented by a handful of "rogue" supervisors); *Tracy v. Dean Witter Reynolds, Inc*., 185 F.R.D. 303, 311 (D. Colo. 1998) (although some managers subjected some individuals to unpaid overtime, "that fact alone does not lead [one] to conclude that there must be some unlawful national policy out there somewhere").

[7] *See also Saleen*, 649 F. Supp. 2d at 940 (affirming magistrate judge's denial of conditional certification where evidence showed that some members of the putative class were paid for the time in question); *Fox v. Tyson Foods, Inc*., 2006 U.S. Dist. LEXIS 97723, *17-18 (N.D. Ala. Nov. 15, 2006) (denying certification where the evidence showed that some proposed class members were compensated for the time at issue while other proposed class members were not).

of the class members worked off-the-clock during any given week, and if so, how many hours were worked.") (emphasis added).[8] Because of this, no manageable collective exists and the Court must deny Plaintiff's Motion.  *See Thompson,* 2008 U.S. Dist. LEXIS 115050, at \*30 (stating "[b]efore subjecting an employer to the weighty burdens of a collective action, the Plaintiffs must establish a colorable basis for their claim that a manageable class" exists).

### D.    Individualized Defenses Will Dominate Any Liability Determination.

The similarly situated analysis evaluates "whether the potential defenses pertain to the opt-in class as a whole or whether many different defenses will be raised with respect to each individual plaintiff." *Reyes v. Tex. EZPawn, L.P.*, No. V-03-128, 2007 U.S. Dist. LEXIS 1461, at \*25 (S.D. Tex. Jan. 8, 2007); *see also Vinsant*, 2018 U.S. Dist. LEXIS 111784, at \* 6; *McElroy*, 2018 U.S. Dist. LEXIS 183072, at \*5 (denying conditional certification, noting "[w]ith regards to the similarly-situated inquiry, Plaintiffs must demonstrate that they are similarly situated 'in relevant respects given the claims and defenses asserted.'" [citation omitted]). Although individualized defenses are often considered at the decertification stage, district courts must determine at the conditional certification stage "whether, as a matter of sound management, a manageable class exists." *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 892 (N.D. Iowa 2008) (citations omitted).

"Individualized inquiries into work practices and supervisor management decisions . . . cannot be addressed on a class-wide basis." *Gatewood v. Koch Foods of Miss., LLC*, No. 3:07CV82-KS-MTP, 2009 U.S. Dist. LEXIS 113896, at \*67 (S.D. Miss. Oct. 20, 2009).  Here,

---

[8]*See also Lugo v. Farmer's Pride Inc.*, 737 F. Supp. 2d 291, 304 (E.D. Pa. 2010) (noting that "some general similarities" between putative class members is insufficient for conditional certification where they work under different managers with different schedules and have different amounts of allegedly uncompensated time); *Simmons*, 2007 U.S. Dist. LEXIS 5002, at \*3 (denying conditional certification where plaintiff failed to show commonality as to the amount of time class members performed off the clock work).

the complexity, inefficiency, and unfairness of trying this case as a collective action are readily

apparent. As one district court recognized:

> The evidence shows a large factual variety among the individual Plaintiffs' claims
> and the times they allege they worked off the clock.  These differences in the
> Plaintiffs' claims mean that the Defendant's defenses would also vary.

*Proctor v. Allsups Convenience Stores, Inc*., 250 F.R.D. 278, 283 (N.D. Tex. 2008).

 Defenses available to Defendants here include, but are not limited to, proof that: (1) a

plaintiff did not work in excess of 40 hours in a particular week; (2) a plaintiff worked in excess

of 40 hours but received overtime; (3) if a plaintiff did work off the clock, Defendants were

unaware of it or subsequently corrected it; (4) a plaintiff was not instructed to work off the clock

or, if she was, the instruction was outside the scope of authority and contrary to Defendants'

policies; (5) even if a plaintiff worked off-the-clock, the employee unreasonably failed to avail

herself of curative steps provided by Defendants; (6) a plaintiff had actual and/or constructive

knowledge of Defendants' policies banning off-the-clock work but chose to violate that policy;

and (7) any off-the-clock work falls within the *de minimis* exception to the FLSA. *See Proctor,*

250 F.R.D. at 283; *Douglas,* 888 F. Supp. 2d at 935-36 (discussing that individualized defenses

warrant decertification). Conditional certification should not be granted here because these

individualized inquiries cannot be resolved on a class-wide basis.

## V.     PLAINTIFF'S MOTION SHOULD BE DENIED BECAUSE SHE PROVIDES NO EVIDENCE THAT OTHER INDIVIDUALS SEEK TO JOIN THE LAWSUIT.

Typically, plaintiffs must show that other employees are interested in joining a collective

action before using the resources of the Court and the employer to notify a group of individuals

of the lawsuit. *See Nixon*, 2015 U.S. Dist. LEXIS 179575, at *7-8 (noting a split between courts

in the District and assuming, without deciding, that the FLSA requires a showing that

potential class members would wish to opt into the litigation if given the opportunity); *Collins*,

2013 U.S. Dist. LEXIS 54955, at *7 (denying conditional certification, holding "This Court also requires that named plaintiffs make a preliminary factual showing that similarly-situated potential plaintiffs actually exist"). This requirement is necessary to ensure that the collective action mechanism is being used appropriately to promote judicial efficiency rather than as a tool to burden a defendant and the Court. *See Collins*, 2013 U.S. Dist. LEXIS 54955; *Butcher*, 2013 U.S. Dist. LEXIS 54964.  As the Honorable Judge Wright explained:

> [P]laintiffs must do more than speculate that putative opt-in plaintiffs would be interested in joining a collective action. Without such a requirement, the parties and the Court could waste valuable resources issuing notice to potential plaintiffs only to find that the case cannot proceed as a collective action.

*Collins,* 2013 U.S. Dist. LEXIS 54955, at *7.

Here, other than the two individuals who have already opted in (and thus do not require notice), Plaintiff has identified no other employee who has demonstrated an interest in joining this lawsuit. Though she claims that she "believes" others would want to join this lawsuit, she does not identify a single employee who has an interest in joining this lawsuit. (*See* Hatch Decl., ¶ 13.) This fact alone warrants denial of Plaintiff's Motion. *See Butcher*, 2013 U.S. Dist. LEXIS 54964, at *10-13 (denying conditional certification, holding the "mere anticipation that others may want to join the lawsuit" is insufficient to warrant conditional certification [citations omitted]); *Morales v. Thang Hung Corp.,* No. 4:08-2795, 2009 U.S. Dist. LEXIS 71765, at *10 (S.D. Tex. Aug. 14, 2009) (denying conditional certification where there was only one other opt-in plaintiff and plaintiff stated that he believed at least three others were interested in joining).

**VI.     ANY CLAIM FOR A NATIONWIDE COLLECTIVE ACTION FAILS BECAUSE PLAINTIFF HAS NO KNOWLEDGE OF ANY ENTITY OUTSIDE ARKANSAS TOTAL CARE, AND THE CARE COORDINATOR POSITION IS UNIQUE TO ARKANSAS.**

Plaintiff's Complaint is unclear as to whether she intends her purported representative action to cover Care Coordinators for Arkansas Total Care, or whether she seeks to extend her

action outside of Arkansas to employees of Centene Management in other states. (*See* Complaint, ¶ 59.) However, Plaintiff's Motion limits the class to Care Coordinators who worked for Arkansas Total Care. (*See* Motion, p. 2; *see also* Notice of Right to Join Lawsuit, Doc. 13-1, p. 1.) Neither this Court nor Defendants should be tasked with clarifying or speculating as to the scope of the putative collective Plaintiff seeks to represent. *See Freeman*, 256 F. Supp. 2d at 945 (noting it was "incumbent upon Plaintiff to propose a class that is sufficiently defined and manageable from the outset"); *see also Villegas-Rivas v. Odebrecht Constr., Inc*., Case No. 4:18-CV-11812018, U.S. Dist. LEXIS 174525, at *8-9 (S.D. Tex. Oct. 10, 2018) (dismissing collective action allegations for failure to adequately define a collective, and finding "[i]t is not defendants' responsibility to define the putative class by piecing together factual allegations strewn throughout a complaint; rather, fair notice requires the plaintiffs to clearly define the putative collective class"). Without waiving objections to any attempt by Plaintiff to broaden her collective beyond that asserted in her Motion, to the extent Plaintiff attempts to certify a group beyond Care Coordinators for Arkansas Total Care, the Court must deny Plaintiff's Motion.

Courts routinely deny conditional certification where the plaintiff seeks to certify a group of individuals extending to business locations of which the plaintiff and her witnesses have no knowledge. *See Campbell v. Nw. Health & Rehab., Inc*., No. 4:12-cv-176-DPM, 2014 U.S. Dist. LEXIS 18379, at *7-9 (E.D. Ark. Feb. 13, 2014) (Marshall, J.) (limiting conditionally certified collective in case involving claim for unpaid work time, noting "The as-applied nature of Plaintiffs' theory makes the varying supervisors and circumstances necessarily critical in evaluating what employees were similarly situated. . . .  In sum, there might well have been a problem from time to time in the jobs where [plaintiffs] worked, but the record discloses no real likelihood that the problem extended facility-wide to all hourly employees."); *Smith v. Frac Tech*

*Services, LLC*, Case No. 4:09-cv-00679-JLH, 2009 U.S. Dist. LEXIS 109930, at \*5-6 (E.D. Ark. Nov. 24, 2009) (Holmes, J.) (granting conditional certification as to service supervisor position based on nine affidavits from different geographic locations, but denying motion as to two other positions for which only two and one affidavits were submitted, respectively).[9]

Here, it is undisputed that the Care Coordinator position was created for and is unique to Arkansas Total Care. (Gaddis Decl., ¶ 6.)  Plaintiff and the Opt-in Plaintiffs confirm under oath that they worked only as Care Coordinators for Arkansas Total Care, based out of the Little Rock office. (Hatch Decl., ¶¶  3-4; D'Anna Decl., ¶¶ 3-4; Haywood Decl., ¶¶ 3-4; *see also* Gaddis Decl., ¶ 12.) They had no reason to contact any individual working for health plans in other states. (*See* Gaddis Decl., ¶ 13.) Plaintiff claims no knowledge of any entity outside of Arkansas Total Care or any other position outside of the Care Coordinator position. (*See* Hatch Decl.; *see also* D'Anna Decl.; Haywood Decl.) Plaintiff presents absolutely no claim or evidence of any knowledge, facts, or policies outside of Arkansas Total Care. Under these facts, conditional certification of a nationwide collective action would be highly inappropriate.

---

[9] *See also, e.g., Martinez*, 265 F.R.D. at 498 (narrowing collective action class to employees who worked at the same facility as Plaintiff, were compensated on the challenged "gang time" system, and wore personal protective equipment); *Roussell v. Brinker Intern., Inc.*, 2009 WL 3149612, at \*1 (S.D. Tex. Apr. 29, 2009), *aff'd*, 441 Fed. Appx. 222 (5th Cir. 2011) (finding to extent plaintiffs' allegations "could be considered evidence of a pattern and practice of behavior, it would be confined to the managers and/or stores that the deposed opt-ins represent"); *West v. Border Food, Inc.*, Case. No. 05-2525, 2006 U.S. Dist. LEXIS 96963, at \*10-11 (D. Minn. June 12, 2006), *adopted* 2006 U.S. Dist. LEXIS 46506, at \*28-29 (D. Minn. July 10, 2006) (denying conditional certification where declarations from six managers only represented approximately 2.5 percent of the potential collective); *Wacker v. Pers. Touch Home Care, Inc.*, No. 4:08CV93 CDP, 2008 U.S. Dist. LEXIS 101079, at \*9 (E.D. Mo. Nov. 6, 2008) (refusing to consider declaration which "states that she is 'very familiar with' and has 'direct knowledge of' the national and local operations and policies of Personal Touch, but the affidavit provides nothing specific to explain how, from her office in Missouri, she learned the facts she purports to know about the operations of the other affiliates.'")

## VII. PLAINTIFF'S PROPOSED NOTICE METHOD AND FORMS ARE HARASSING, OBJECTIONABLE, AND PREMATURE.

Plaintiff's Motion requests that this Court approve a plan of bombarding putative collective members with solicitations, including text messaging with a link to a website containing the Notice and Consent forms, and then following up with a postcard via regular mail, posting Notice at Defendants' facilities, and for those text messages that are unsuccessful, sending an additional electronic communication by email along with Notice and Consent forms. (*See* Motion, ¶¶ 9-12; Brief, pp. 15-16.) In support of this excessive request, Plaintiff offers the declaration of her counsel, which is riddled with objectionable opinions. (*See* Declaration of Josh Sanford, Doc. 13-6 ["Sanford Decl."].) Plaintiff argues that because politicians use text-messaging and emails, courts should oversee similar campaigns to solicit participation in collective actions under the FLSA. (*See* Brief, p. 12). This Court should reject Plaintiff's unreasonable requests.

### A. The Content Of Plaintiff's Proposed Communications Must Be Revised.

First, regarding the content of Plaintiff's proposed communications to the putative class, a meet and confer would be required due to several deficiencies in the communications, including but not limited to:

- The communications need disclaimers that the Court has authorized the notice but takes no positon concerning the merits of the case (*see* Docs. 13-1 to 13-5).

- The communications must be revised to delete implications that any individual who joins the action will recover wages (*see* Docs. 13-1 to 13-5).

- The communications must be revised to delete implications that this lawsuit will settle (*see* Doc. 13-1 p. 2).

- The communications must be revised to accurately reflect the scope of the collective that has been conditionally certified, as described in Section VI above.

*See generally, e.g., Nixon*, 2015 U.S. Dist. LEXIS 179575, at *9 (ordering parties to meet and

confer concerning the proper notice form); *Vinsant*, 2018 U.S. Dist. LEXIS 111784, at \*17-21 (ordering that a disclaimer be added to the notice).

**B.      Any Notice Should Be Disseminated By A Third-Party Administrator By Regular Mail Only And The Court Should Deny Plaintiff's Request For Putative Class Members' Personal Information.**

Regarding Plaintiff's request for notice by **text message**, the Court should reject not only Plaintiff's request to solicit putative collective members via text message with linked Notice and Consent forms, but also her request for individuals to **opt into this lawsuit on their smartphone with a few clicks**. (*See* Text of Electronic Transmissions, Doc. 13-3, p. 1; Sanford Decl., ¶¶ 26, 28; Brief, pp. 8-17.) Plaintiff cites no legal authority or precedent for permitting such invasive solicitation. (*See* Brief, pp. 8-17). There is no reason to denigrate litigation by authorizing parties to join a lawsuit by clicking a response to a text message. Plaintiff's "proposed format for the text message – a message with a link to a URL containing the actual notice and Consent to Join form – is [also] . . . invasive."[10] Besides potentially causing the putative plaintiffs to incur charges for the receipt of texts, sending notice by text may also violate the Telephone Consumer Protection Act ("TCPA").[11]

Plaintiff cites only her own unqualified opinions and the unqualified opinion of her counsel concerning text messaging versus emailing and other forms of notice. (*See id., citing*

---

[10] *Brandenburg v. Cousin Vinny's Pizza, LLC*, No. 3:16-cv-516, 2017 U.S. Dist. LEXIS 129955, at \*18-19 (S.D. Ohio Aug. 14, 2017); *see also Aguirre v. Tastee Kreme #2, Inc*., No. H-16-2611, 2017 U.S. Dist. LEXIS 83944, at \*22-24 (S.D. Tex. Apr. 13, 2017), *objection sustained by, in non-relevant part,* 2017 U.S. Dist. LEXIS 83327 (S.D. Tex., May 31, 2017) (denying request for dissemination of notice by text message and finding that "text messaging could be misleading").

[11] *See Miller v. JAH, LLC*, No. 5:16-cv-01543-AKK, 2018 U.S. Dist. LEXIS 2139, at \*8 (N.D. Ala. Jan. 5, 2018) (notice by text will subject putative class member to the "annoyance of unsolicited messages that Congress passed the [TCPA], in part, to address"). The TCPA generally prohibits text messages unless the caller has "prior express consent." *Id.*, § 227(b)(a); *see also* 2003 TCPA Rule, ¶ 165. The fact that employees provide their phone numbers to their employer does not provide consent to receive text messages from an unrelated third party. *See id.; Miller*, 2018 U.S. Dist. LEXIS 2139, at \*8.

Sanford Decl., ¶¶ 5-14, 17-22, 28, 30-31.) Specifically, the following **opinions found in Mr. Sanford's declaration are inadmissible** and must not be given any weight by the Court:

- "Clearly, however, most people do not call to follow up after mailing their signed Consents, assuming that by putting their Consents in the mail, we will receive the Consents and join them in the lawsuit." (Sanford Decl., ¶ 7.)

- "However, even one member failing to join the lawsuit through no fault of his or her own, but merely because the signed Consent gets lost in the mail, is too many." (*Id.*, ¶ 14.)

- "Allowing Plaintiff's counsel to send a follow-up reminder to any class members who have not responded to our offices within thirty (30) days after the mailing of the initial *Notice* would provide a fair and equitable solution to ensure that more members of the proposed class who want to join the lawsuit are able to. Moreover, this would not cause any prejudice to Defendants." (*Id.*, ¶ 15.)

- "One of the features that email provides as opposed to traditional mail is faster feedback if an incorrect address is used. That (generally) immediate feedback that an email is undeliverable is useful information to have when the intended recipient has a defined period of time within which he must respond." (*Id.*, ¶ 17.)

- "Similarly, text messages are far more efficient and reliable than the U.S. Mail and also provides immediate feedback when text messages are undelivered. (*Id.*, ¶ 18.)

- "If the goal is to present information to the recipient, texting is measurably the most effective way to get it done. (*Id.*, ¶ 23.)

- "It is not a hardship on an employer to include in the contact information that it shares with us after certification the telephone that it has in its records for each class member." (*Id.*, ¶ 24.)

- "The class of opt-ins would benefit by the ease and efficiency of a paperless notice and consent process via email and text message." (*Id.*, ¶ 25.)

- "It is a practical benefit to many putative class members to be able to sign documents electronically and to transmit them via cellphones. It is not a hardship on Defendants for potential opt-ins to receive Notice and Consent, and to return Consents to Join to Plaintiff's counsel, in this manner." (*Id.*, ¶ 27.)

- "RightSignature is an easy and efficient means of obtaining signatures for plaintiffs and potential plaintiffs who are hard to reach or who do not have easy access to computers, much less printers, scanners, or fax machines. Unlike computers, many individuals keep their smartphones with them at all times." (*Id.*, ¶ 29.)

- "While RightSignature is an efficient way to obtain signatures, the process for completing a signature is not completely intuitive. After signing a document, RightSignature requires the signer to press 'preview signature.' Many signers believe that once they have pressed this option they have signed and submitted the document. . . . Many potential plaintiffs believe they have opted in to a lawsuit after the first step, when in fact they have not actually submitted a signed document." (*Id.*, ¶ 30.)

*See* Fed. R. Civ. Proc. 56(c)(1) (affidavits submitted by a party must be made on personal knowledge); *Sjoblom*, 2007 U.S. Dist. LEXIS 93879 (striking affidavits in wage-hour action where affidavits were not based upon affiants' personal knowledge, constituted or relied on hearsay, contained conclusory allegations, or constituted speculation and unsupported personal beliefs); *Friedel v. City of Madison*, 832 F.2d 965 (7th Cir. 1987) (holding declaration of plaintiffs' counsel inadmissible where the affidavit attached unsworn witness interviews). Moreover, other testimony by Plaintiff's counsel is irrelevant, and to the extent it is relevant Plaintiff's counsel has inappropriately positioned himself as a witness in the case. (*See* Sandford Decl., ¶¶ 4-6, 8-13, 16, 19, 20, 21.)

The Court should likewise reject Plaintiff's request for notice by **email and by posting at Defendants' facilities**. Plaintiff has not provided any factual basis for presuming that putative collective members would not receive notice submitted by regular mail. *See, e.g., Vinsant*, 2018 U.S. Dist. LEXIS 111784, at *17-21 (denying plaintiffs' request to disseminate notice via text message, or in the alternative, via email, and denying plaintiffs' request for an order requiring defendant to produce email addresses and phone numbers for putative collective members); *Rowe v. Hamilton,* No. 6:16-03259-CV-RK, 2017 U.S. Dist. LEXIS 21726, at *6-8 (W.D. Mo. Feb. 16, 2017) (denying plaintiffs' requests for notice by email and for an order requiring defendant to produce email addresses for putative class members); *Stickle v. SCI W. Mkt. Support Ctr., L.P.*, 2009 WL 3241790, at *7 (D. Ariz. Sept. 30, 2009) (denying plaintiff's request to order notice by email or by posting); *Reab v. Electronic Arts, Inc.*, 214 F.R.D. 623,

630 (D. Colo. 2002) (denying request for notice by email).[12] The Court should also reject Plaintiff's request for a reminder notice, as it would be "redundant" and "could be interpreted as an endorsement of the lawsuit." *Kilpatrick v. Homeality, LLC*, No. 4:16-CV-00885 BSM, 2017 U.S. Dist. LEXIS 206896, at *6-7 (E.D. Ark. Sept. 26, 2017) (Miller, J.).

Furthermore, as supported by Plaintiff's counsel's sworn statement that his firm has a history of encountering problems when distributing notice in conditionally certified actions, the **Court should appoint a third-party administrator** to distribute any notice in this action. (*See* Sanford Decl., ¶¶ 7-11.) Use of a third-party administrator preserves the privacy of putative collective members and requires that Defendants produce personal information concerning employees and former employees to only the third-party administrator on a confidential basis. Given that an administrator can be used, Plaintiff's **demand for an order requiring production of private information** concerning putative collective members is moot.[13] Indeed, the only

---

[12] The cases cited by Plaintiff are distinguishable, because in those cases the court found that unique circumstances necessitated class notice beyond the typical notice by regular mail. (*See e.g,* Brief, p. 12 [*citing Bhumithanarn v. 22 Noodle Mkt. Corp.*, No. 14-CV-2625(RJS), 2015 U.S. Dist. LEXIS 90616, at *5 (S.D.N.Y. July 13, 2015)(unpublished) (giving the plaintiff permission to notice potential opt-ins via text message, reasoning that the restaurant industry had high turnover and text messaging was the defendant's favored method of communication)].)

[13] *See Syed v. M-I, L.L.C.*, No. 1:12-CV-1718 AWI MJS, 2014 U.S. Dist. LEXIS 165465, at *22-23 (E.D. Cal. Nov. 26, 2014) (holding that "the concerns about privacy are significant," and therefore plaintiffs' counsel will not be given potential class members contact information but instead the "data will be provided to the third party administrator only, who must take a more active role in this process"); *Nehmelman v. Penn National Gaming, Inc*., 822 F. Supp. 2d 745, 764 (N.D. Ill. 2011) (ordering that third-party administrator be used to disseminate notice and explaining "[o]f course, if a third-party administrator were to be designated to issue the notices, it is unclear why Plaintiff would need the requested information"); *Robinson v. Empire Equity Group, Inc*., 2009 U.S. Dist. LEXIS 107607, at *20 (D. Md. Nov. 18, 2009) (holding that the plan for sending the notice should include "safeguards for the privacy of potential class members, such as a requirement that notices be mailed by a neutral third-party administrator"); *In re Am. Family Mut. Ins. Co. Overtime Pay Litig.*, MDL Docket No. 1743, 2009 U.S. Dist. LEXIS 11169, at *11 (D. Colo. Feb. 3, 2009) (finding that "use of a third-party administrator is appropriate to protect the integrity of the process and to protect the confidential information of potential opt-in plaintiffs").

contact information that Plaintiff's counsel may need is that of putative collective members who actually choose to opt into this action. Furthermore, even if a third-party administrator is not used, producing phone numbers and email addresses for the entire putative collective is unnecessary as any Notice should be sent by only regular mail.[14]

Providing the putative collective list only to the third-party administrator will ensure that the notice process remains objective and will avoid the potential for abuse or misleading communications to the putative collective members. Indeed, granting Plaintiff access to contact information for all current and former employees creates the potential for the very type of improper and unsupervised communications that the Supreme Court has warned against. *See Hoffmann-La Roche Inc.*, 493 U.S. at 171 (noting potential for abuse in unsupervised communications between counsel and putative collective members); *see also In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 441 (S.D. Tex. 1999) (finding that "unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts").

## VIII.   CONCLUSION

Defendants respectfully request that the Court deny Plaintiff's Motion for Conditional Certification, for Disclosure of Contact Information, and to Send Notices (Doc. 13), and grant Defendants such other relief as may be just.

---

[14] For example, production of business email addresses is highly intrusive and unjustified. *See e.g., Williams v. Coventry Health Care of Florida, Inc.*, 2016 WL 7013530, at *2 (M.D. Fla. Oct. 4, 2016), *report and recommendation adopted*, 2016 WL 6947354 (M.D. Fla. Nov. 28, 2016) (denying plaintiff's request for an order requiring production of business email addresses for putative class and noting that "[r]equiring Defendant to disclose and allow for the use of the work email addresses it provides to its employees is more intrusive than allowing Plaintiff to utilize personal email addresses"); *Hart v. U.S. Bank NA*, 2013 U.S. Dist. LEXIS 160147, at *19 (D. Ariz. Nov. 8, 2013) (same).

Dated: November 13, 2018

_/s/ Breanne Sheetz Martell_
Eva C. Madison (98183)
emadison@littler.com
LITTLER MENDELSON, P.C.
217 E. Dickson Street, Suite 204
Fayetteville, AR  72701
Telephone:        479.582.6100
Facsimile:        479.582.6111

Douglas E. Smith, _Pro Hac Vice_
desmith@littler.com
Breanne Sheetz Martell, _Pro Hac Vice_
bsmartell@littler.com
LITTLER MENDELSON, P.C.
One Union Square
600 University Street, Suite 3200
Seattle, WA 98101-3122
Telephone:        206.623.3300
Facsimile:        206.447.6965

Attorneys for Defendants
ARKANSAS TOTAL CARE, INC.,
CENTENE CORPORATION and CENTENE
MANAGEMENT COMPANY, LLC

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on November 13, 2018, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Chris Burks     chris@sanfordlawfirm.com

Joshua Sanford    josh@sanfordlawfirm.com


           */s/ Breanne Sheetz Martell*    


FIRMWIDE:159149682.7 095402.1003